**J.R., M.R. and W.K.J., Plaintiffs,**

**v.**

**The State of UTAH, a governmental entity; Michael Leavitt, Governor of the State of Utah; Mark Shurtleff, Attorney General of the State of Utah; and Barry Nangle, Director, Office of Vital Records and Statistics, Center for Health Data, Utah Department of Health, Defendants.**

**Civil No. 2:02–CV–0195J.**

United States District Court,
D. Utah,
Central Division.

April 15, 2002.

Brian M. Barnard, James L. Harris, Jr., Utah Legal Clinic, Salt Lake City, UT, for plaintiffs.

Philip C. Pugsley, Utah Attorney General's Office, Salt Lake City, UT, for defendants.

## ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

JENKINS, Senior District Judge.

The plaintiffs, J.R., M.R. and W.K.J., filed the instant action against the defendants under 42 U.S.C. § 1983 (2000) on March 6, 2002, seeking declaratory and injunctive relief, nominal monetary damages and attorney's fees against the defendants arising from an alleged violation of plaintiffs' federal and state constitutional rights resulting from defendants' compliance with Utah Code Ann. § 76-7-204 (1999), a Utah statute dealing with the validity and enforcement of contracts involving surrogate motherhood.

On May 7, 2002, plaintiffs filed a motion for summary judgment (dkt. no. 24); on September 5, 2002, after conducting limited discovery, the defendants filed a motion for summary judgment (dkt. no. 42), at the same time responding to plaintiffs' earlier motion. (Memorandum in Support of Defendants' Motion for Summary Judgment and in Opposition to Motion Filed by Plaintiffs, filed September 5, 2002 (dkt. no. 43) ("Defs' Mem.").) Plaintiffs filed a reply memorandum, together with exhibits (dkt. nos. 46–48).[1]

---

1. Plaintiffs exhibits were separately filed under the case caption, but without the authenticating affidavits contemplated by Fed.R.Civ.P. 56(e). *See, e.g., T.J. Smith & Nephew, Ltd. v. Parke, Davis & Co.,* 623 F.Supp. 808, 813 (D.Utah 1985); 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2722, at 382–84 & nn. 40–42 (3d ed.1998). Absent objection by the defendants, and given the nature of the particular items submitted, this court has treated the

The motions were heard on September 17, 2002. Brian M. Barnard appeared on behalf of the plaintiffs; Philip C. Pugsley, Assistant Attorney General, appeared on behalf of the defendants. Having reviewed the memoranda, affidavits and exhibits submitted by the parties, and having heard the arguments of counsel, the court took the matter under advisement.

## FACTUAL BACKGROUND

The facts in this case remain essentially undisputed.

M.R. and J.R., husband and wife, are citizens of the State of Utah, as is W.K.J., an unmarried adult woman. Unable for medical reasons to have children on their own, J.R. and M.R., entered into a written agreement[2] with W.K.J. in February 1999 in which W.K.J. agreed to serve as a gestational carrier surrogate[3] for a child to be conceived *in vitro* by J.R. and M.R. W.K.J. agreed to carry the implanted embryo through delivery, to have J.R. and M.R.'s names entered on the child's birth certificate as the parents of the child, and to

"voluntarily surrender and waive all custody rights, if any, to the child's parents immediately upon birth of the child." (Agreement at 4 ¶ 11.) To that end, W.K.J. agreed to "fully cooperate with any paternity/maternity proceedings or adoption proceedings necessary to establish parentage on behalf of the Intended Parents," J.R. and M.R., and to "sign all affidavits and consents and attend any scheduled court hearing(s) either prior to or after the birth of the child to finalize the proceedings." (*Id.* at 3 ¶ 10.)

In consideration for W.K.J.'s services as a gestational carrier surrogate,[4] J.R. and M.R. agree to pay a list of various expenses, including legal fees, incurred by W.K.J. in connection with her pregnancy and childbirth under the terms of the Agreement. (*Id.* at 2 ¶ 5, 3 ¶ 10, 4 ¶ 11, 5 ¶¶ 14(A) 14(G).)[5] They also agree to "immediately accept custody and assume full legal responsibility for the child born to [W.K.J.] pursuant to this Agreement," (*id.* at 4 ¶ 11), and promise to take the child *as*

plaintiffs' exhibits as authentic for the purposes of the pending summary judgment motions, but only for that purpose. *See id.* § 2722, at 384 & n. 43.

2. *See* "IN VITRO/SURROGATE IMPLANTATION AGREEMENT," dated February 25, 1999 (the "Agreement"), *annexed to* Exhibit re: Surrogacy Agreement, filed September 16, 2002 (dkt. no. 47).

3. This nomenclature is suggested by Adam P. Plant, Commentary, *with a Little Help from My Friends: the Intersection of the Gestational Carrier Surrogacy Agreement, Legislative Inaction, and Medical Advancement*, 54 Ala. L.Rev. 639, 640–41 & n. 6 (2003).

4. W.K.J. made additional promises, from agreeing to "adhere to a healthy diet," to follow "all medical instructions given to her," to abstain from "dangerous sports or activities," smoking cigarettes, drinking alcohol, engaging in "any 'unsafe' sexual activity," or using illegal drugs, to submitting to medical and psychological evaluations and waiving

confidentiality as to any reports or diagnoses. (Agreement at 2, 3.)

5. Curiously, both plaintiffs and defendants assert that "[n]o contractual consideration was exchanged between W.K.J. and J.R. and M.R. as part of the Agreement." (Plaintiffs' Statement of Undisputed Facts re: Motion for Summary Judgment, filed May 7, 2002 (dkt. no. 26), at 6 ¶ 20; *accord,* Complaint at 6 ¶ 20; *see* Defs' Mem. at 8 ("Under the general rules of contract law, this agreement is not supported by consideration.").) The Court, on the other hand, finds itself at a loss to describe the parties' mutual exchange of promises in any other way-assuming that the parties intended their Agreement to be binding. *See, e.g., Resource Management Co. v. Weston Ranch and Livestock Co., Inc.,* 706 P.2d 1028, 1036 (Utah 1985) ("Consideration is an act or promise, bargained for and given in exchange for a promise."). Plaintiffs may simply be trying to plead within Utah Code Ann. § 76-7-204(2) (referring to "[a]n agreement which is entered into, without consideration given").

*is*—"recognizing that the child may have genetic or congenital abnormalities." (*Id.*)

Shortly after the making of the Agreement, viable embryos conceived *in vitro* using J.R.'s ova and M.R.'s sperm were implanted in W.K.J.'s uterus through a procedure performed in the State of California.[6] W.K.J. carried her pregnancy to term, giving birth to twin children in January, 2000, in Salt Lake County, State of Utah.

Notwithstanding the terms of the Agreement and the facts surrounding the plaintiffs' gestational surrogacy procedure, the Utah State Office of Vital Records and Statistics has declined plaintiffs' request that birth certificates be issued listing J.R. and M.R. as the parents of the two children. Instead, the existing birth certificates list W.K.J. as the mother and no one as the father. While defendant Nangle, acting as Director of that Office, has indicated that M.R. could be added to the certificates as father of the children based upon M.R. and W.K.J.'s acknowledgment, the Office would decline to remove W.K.J. and list J.R. as the mother of the children, at least "based solely on the written representations of W.K.J., M.R. and J.R. that J.R. is the biological mother of the children." (Plaintiffs' Statement of Facts at 8–9 ¶¶ 30–31.)

## PLAINTIFFS' LEGAL THEORIES

Plaintiffs seek declaratory and injunctive relief (1) holding Utah Code Ann. § 76–7–204 (1999) unconstitutional under the Fourteenth Amendment to the United States Constitution and Article I, §§ 7 and 25 of the Utah Constitution; (2) forbidding compliance with or enforcement of Utah Code Ann. § 76–7–204 by the defendant state officers; (3) validating the plaintiffs' In Vitro/Surrogate Implantation Agreement; and (4) requiring that the Utah Office of Vital Records and Statistics issue birth certificates for the plaintiffs' children "reciting that J.R. and M.R. are the parents of the children." (Complaint, filed March 6, 2002 (dkt. no. 1), at 2 ¶ 1.)

Utah Code Ann. § 76–7–204 (1999) reads:

**76–7–204. Prohibition of surrogate parenthood agreements-Status of child-Basis of custody.**

(1) (a) No person, agency, institution, or intermediary may be a party to a contract for profit or gain in which a woman agrees to undergo artificial insemination or other procedures and subsequently terminate her parental rights to a child born as a result.

(b) No person, agency, institution, or intermediary may facilitate a contract prohibited by Subsection (1). This section does not apply to medical care provided after conception.

(c) Contracts or agreements entered into in violation of this section are null and void, and unenforceable as contrary to public policy.

(d) A violation of this subsection is a class B misdemeanor.

(2) An agreement which is entered into, without consideration given, in which a woman agrees to undergo artificial insemination or other procedures and subsequently terminate her parental rights to a child born as a result, is unenforceable.

---

**6.** By its express terms, the Agreement "will be governed and interpreted by California law" and all parties "specifically submit to the jurisdiction of the California courts in resolving any dispute." (Agreement at 7 ¶ 22.) It also incorporates an arbitration clause requiring that "[a]ny and all disputes relating to this Agreement or breach thereof shall be settled by arbitration in the State of Utah, in accordance with the then-current rules of the American Arbitration Association, . . ." (*Id.* at 7 ¶ 26.) These provisions appear to contradict each other.

(3) (a) In any case arising under Subsection (1) or (2), the surrogate mother is the mother of the child for all legal purposes, and her husband, if she is married, is the father of the child for all legal purposes.

(b) In any custody issue that may arise under Subsection (1) or (2), the court is not bound by any of the terms of the contract or agreement but shall make its custody decision based solely on the best interest of the child.

(4) Nothing in this section prohibits adoptions and adoption services that are in accordance with the laws of this state.

(5) This section applies to contracts or agreements that are entered into after April 24, 1989.

Plaintiffs J.R. and M.R. assert that the statute infringes upon their fundamental constitutional right to procreate by denying them the right to make an enforceable agreement to obtain the assistance of a third party in bearing children that J.R. is medically incapable of bearing on her own. If enforced according to its terms, plaintiffs argue, Utah Code Ann. § 76–7–204 effectively leaves them childless, thereby denying their right to procreate altogether. Further, the statute "[r]emov[es] the possibility that a biological mother can become the legal parent of children produced through gestational surrogacy" because it conclusively presumes the surrogate mother to be the legal parent of the child. (Memorandum in Support of Plaintiffs' Motion for Summary Judgment, filed May 7, 2002 (dkt. no. 25) ("Plts' Mem."), at 23.) This presumption also denies equal protection to J.R., plaintiffs assert, because under Utah law and administrative practice, the genetic/biological father of a child born to an unmarried gestational surrogate may be listed as the father on the child's birth certificate, while the genetic/biological mother may not. (*Id.* at 18–22.)

### The Constitutional Right to Procreate

Counsel points to language in a series of United States Supreme Court cases indicating that "[a]n individual's right to procreate and produce a family is well established in our nation's history and traditions," and that the right to procreate represents " 'a basic liberty,' " " 'one of the basic civil rights of man … fundamental to the very existence and survival of the race.' " (Pltfs' Mem. at 4, 5 (quoting *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)).)

Moreover, the Supreme Court has explicitly recognized that the fundamental right of privacy protected under the Due Process Clause encompasses individual decisions regarding procreation, marriage and parentage. *Carey v. Population Svcs. Int'l,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). The *Carey* Court stated that "it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Id.* (internal quotations and citations omitted) (citing *Skinner,* 316 U.S. at 541–42, 62 S.Ct. 1110). Of all these personal choices, "decisions whether to accomplish or to prevent conception are among the most private and sensitive." *Id.* at 685. Thus, the decision to procreate "is at the very heart of this cluster of constitutionally protected choices." *Id.*; *see also Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); *Glucks-*

*berg*, 521 U.S. at 720, 117 S.Ct. 2258 ("[T]he 'liberty' specially protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, [and] to marital privacy." (internal citations omitted)).

(*Id.* at 5.) The right to procreate, plaintiffs maintain, "is inextricably linked to the right to assume the role of parent to the procreated children." (*Id.* at 6.) They point to cases such as *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), vindicating an unwed father's fundamental interest in the care and custody of his three children, and *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), acknowledging the historical importance of biological relationships to the concept of family.[7] (*Id.*)

Plaintiffs also rely on the Utah Supreme Court's declaration that "the Utah Constitution recognizes and protects the inherent and retained right of a parent to maintain parental ties to his or her child under Article I, § 7 and § 25." *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982). Striking down a Utah law allowing the state to terminate a mother's parental rights involuntarily without a first establishing that she was unfit, the *In re J.P.* court reaffirmed the right to procreate as one of the "rights inherent in family relationships ... which are the most obvious examples of rights retained by the people. They are 'natural,' 'intrinsic,' or 'prior' in the sense that our Constitutions presuppose them." *Id.* at 1373.

## Gestational Surrogacy & the Right to Procreate

J.R. and M.R. assert that "[b]y engaging in the process of gestational surrogacy to produce their own child, J.R. and her husband, M.R. have exercised their fundamental right to procreate." (Reply & Response Memorandum in Support of Plaintiffs' Motion for Summary Judgment, filed September 16, 2002 (dkt. no. 46) ("Pltfs' Reply/Resp. Mem."), at 8.) They argue that Utah Code Ann. § 76-7-204 unduly burdens the exercise of their right to procreate by declaring surrogacy contracts to be unenforceable. This attempt to limit access to this procreative means may be justified only by compelling state interests. In *Carey*, for example, a state law restricting access to contraceptives was held to limit the exercise of the right to decide *not* to procreate, and did not survive strict scrutiny. *Carey v. Population Services International*, 431 U.S. 678, 686–91, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). Likewise, plaintiffs insist, Utah's surrogacy statute limits these plaintiffs' access to medical technology that enables them to exercise their right to decide *to* procreate-to have children and a family-and it must therefore undergo strict scrutiny as well. (Pltfs' Mem. at 8–16.) "The State has no justifiable interest in preventing infertile couples from procreating through the gestational surrogacy process" absent some profit motive or actual monetary gain, and the State cannot justify the burden imposed upon the exercise of plaintiffs' rights by Utah Code Ann. § 76-7-204 on public policy grounds; plaintiffs submit that the statute should be held unconstitutional under both the federal and Utah constitutions. (*Id.* at 16–18.)

---

7. "[T]he usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), for example, spoke of '[t]he rights to conceive and to raise one's children' as essential rights, ..." *Smith*, 431 U.S. at 843, 97 S.Ct. 2094.

J.R. and M.R. aver that gestational surrogacy represents their only opportunity to "bear or beget a child" that would truly be *theirs*, a true genetic and biological child of the marriage. Absent gestational surrogacy, their marriage would remain childless. Their singular opportunity to procreate through gestational surrogacy necessarily implicates their fundamental right to bear children, thereby invoking the protections of the United States Constitution and the Utah Constitution. *See* Marsha Garrison, *Law Making for Baby Making: An Interpretive Approach to the Determination of Legal Parentage*, 113 Harv.L.Rev. 835, 856 (2000) ("[A] complete state ban on access to reproductive technology thus would also be constitutionally suspect, as it would deprive the infertile of their only chance at genetic parenthood." (footnote omitted)).

On the same basis, Plaintiffs also challenge § 76–7–204(3)(a)'s presumption that "the surrogate mother is the mother of the child for all legal purposes, and her husband, if she is married, is the father of the child for all legal purposes." If this presumption is given conclusive effect, the statute frustrates J.R. and M.R.'s exercise of their right to procreate through gestational surrogacy by denying them legal parenthood of children who are unquestionably their own. Plaintiffs also contend that § 76–7–204(3)(a) infringes on *W.K.J.'s* fundamental right to make procreative decisions by "forc[ing] legal parenthood on her against her will." (Pltfs' Mem. at 14–15.) By creating a statutory presumption that a surrogate is the mother of children born to her, "[i]n effect, the State has declared, against W.K.J.'s own wishes, that W.K.J. has engaged in procreation although the children are not W.K.J.'s genetic or intended children." (*Id.* at 15.) *See Soos v. Superior Court*, 182 Ariz. 470, 897 P.2d 1356, 1361 (1994) (Gerber, J., concurring) (a surrogate's "contract is to carry the child, not to nurture or raise it.").

Beyond that, the plaintiffs challenge the State's existing administrative recordkeeping scheme, under which the genetic/biological father's name may be placed upon the birth certificates of a child born to a gestational carrier surrogate (if the surrogate mother is unmarried), but the genetic/biological mother's name cannot. This disparity, they assert, operates to deny the genetic/biological mother the equal protection of the laws guaranteed by the Fourteenth Amendment. (*Id.* at 18–22.) The court in *Soos* reached essentially the same conclusion in striking down a similar disparity on equal protection grounds: "By affording the Father a procedure for proving paternity, but not affording the Mother any means by which to prove maternity, the State has denied her equal protection of the laws." 897 P.2d at 1361.

**Defendants' Response**

Counsel for the defendants acknowledges that "[t]he ability to procreate and decisions between a man and wife relating thereto have been considered to be a fundamental right under the Due Process Clause of the United States Constitution, and that 'if privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.'" (Defs' Mem. at 9 (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)).) Counsel argues that § 76–7–204 does not infringe upon J.R. and M.R.'s fundamental right to procreate because that right has not yet been extended to embrace gestational surrogacy: "the Supreme Court has not extended the fundamental right to procreate to encompass the type of reproductive technology involved in this case," (*id.* at 9), and cases

such as the *Baby M* case do not extend that right to cover surrogacy arrangements. (*Id.* at 4–7, 9–12.) *See In re Baby M*, 109 N.J. 396, 537 A.2d 1227, 1253, 77 A.L.R.4th 1 (1988) ("The right to procreate very simply is the right to have natural children, whether through sexual intercourse or artificial insemination," and does not include the custody, care, companionship and nurturing that follow birth).

Defendants submit that state legislation such as this should not be struck down unless the finding of unconstitutionality proves to be "strictly unavoidable," (*id.* at 3), and that given appropriate deference, the Utah surrogacy statute should be upheld as against plaintiffs' facial or "as applied" constitutional challenge. (*Id.* at 4.) The statute serves legitimate state interests in the protection of the health and well-being of surrogate mothers and the children born to them, and in avoiding the commercialization of childbirth: " '[a]s overwhelmingly repugnant as the thought may be, unbridled surrogacy for profit could encourage the treatment of babies as commodities.' " (*Id.* at 13–20 (quoting *Doe v. Attorney General*, 194 Mich.App. 432, 487 N.W.2d 484, 486 (1992)).)

Defense counsel contends that Utah's surrogacy statute addresses questions of public policy well suited to determination by the Legislature. (*Id.* at 4–7); *see Johnson v. Calvert*, 5 Cal.4th 84, 97, 19 Cal. Rptr.2d 494, 851 P.2d 776 (1993) ("[w]e are all too aware that the proper forum for resolution of this issue is the legislature, where empirical data, largely lacking from this record, can be studied and rules of general applicability developed."). The "time and research required to study and resolve a complicated social issue such as surrogacy are available to a legislative body," where " 'fact finding can be less

confined and the viewpoints of all interested institutions and disciplines can be presented and synthesized. In this manner only can the subject be dealt with comprehensively and the interests of all institutions and individuals be properly accommodated.' " (*Id.* at 5) (quoting *Calvert*, 5 Cal.4th at 102, 19 Cal.Rptr.2d 494, 851 P.2d at 788 (Arabian, J., concurring) (quoting *Satz v. Perlmutter*, 379 So.2d 359, 360 (Fla.1980))). The Utah surrogacy statute "was passed after due deliberation and study by the Legislature," and "[a] legislative decision having been made in Utah, it should be respected. Thus, in this case, the court should defer to the will of the people because it is reasonable," and deciding otherwise would infringe on the prerogatives of the legislative branch. (*Id.* at 6, 7.)[8]

Defense counsel also asserts that the constitutional questions raised by plaintiffs need not even be decided in this case because the result sought by plaintiffs— full legal recognition of J.R. and M.R. as the parents and guardians of their children and the issuance of conforming birth certificates—may be achieved through Utah adoption proceedings without running afoul of the provisions of the surrogacy statute. (*Id.* at 7–8; *see* Utah Code Ann. § 76–7–204(4) ("Nothing in this section prohibits adoptions and adoption services that are in accordance with the laws of this state."); Utah Code Ann. §§ 78–30–1 through 78–30–19 (2002).)

## GESTATIONAL SURROGACY & PLAINTIFFS' CONSTITUTIONAL RIGHTS

While the United States Supreme Court has not yet addressed gestational surrogacy as a constitutional matter, the Court's more recent enumeration of "certain fun-

---

**8.** However, as Chief Justice Stone observed in *Skinner*, "There are limits to the extent to which the presumption of constitutionality can be pressed, especially where the liberty of the person is concerned...." 316 U.S. at 544, 62 S.Ct. 1110 (Stone, C.J., concurring).

damental rights and liberty interests" counsels a broader reading of those rights and interests than the defendants now suggest:

> In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *ibid*; *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and to abortion, *Casey, supra*. We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. *Cruzan*, 497 U.S. at 278–279, 110 S.Ct. 2841.

*Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *accord, Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (describing the "fundamental liberty interest of natural parents in the care, custody, and management of their child").[9]

Moreover, the Utah Supreme Court has defined the "constitutional right of parents" in expansive terms:

> This Court has recently declared that "the ideals of individual liberty which ... protect the sanctity of one's home and family" are "essential in a free society...." *In re Castillo*, Utah, 632 P.2d 855, 856 (1981). A parent has a "fundamental right, protected by the Constitution, to sustain his relationship with his child." *State in re Walter B.*, 577 P.2d 119, 124 (1978) (plurality opinion). It is fundamental to our jurisprudence that "the custody, care and nurture of the child reside first in the parents," *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), and that the parents' right "to direct the upbringing and education of children under their control," *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925), is protected by the Constitution. In *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the Supreme Court included family relationships in the "liberty" of which a state cannot deprive any person without due process of law under the Fourteenth Amendment to the United States Constitution....

*In re J.P.*, 648 P.2d at 1372. Justice Oaks, writing for the Utah Supreme Court, emphasized the deep roots of parents' right to maintain their relationship with their children:

> We deal here with a fundamental principle. The Constitution of Utah

---

**9.** In *Santosky*, even the dissenting Justices did not dispute the principle that "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." 455 U.S. at 774, 102 S.Ct. 1388 (Rehnquist, White, O'Connor, JJ. & Burger, C.J., dissenting).

declares, "Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." Article I, § 27. The cornerstone of democratic government is the conviction that governments exist at the sufferance of the people, in whom "(a)ll political power is inherent...." Utah Const. Art. I, § 2. A residuum of liberty reposes in the people. That liberty is not limited to the exercise of rights specifically enumerated in either the United States or the Utah Constitutions. Thus, Article I, § 25 of the Utah Constitution states, "This enumeration of rights shall not be construed to impair or deny others retained by the people." The Ninth Amendment to the United States Constitution states, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." *See generally Griswold v. Connecticut*, 381 U.S. 479, 486–99, 85 S.Ct. 1678, 1682–90, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); L. Tribe, *American Constitutional Law*, § 11–3 (1978).

The rights inherent in family relationships-husband-wife, parent-child, and sibling-are the most obvious examples of rights retained by the people. They are "natural," "intrinsic," or "prior" in the sense that our Constitutions presuppose them, as they presuppose the right to own and dispose of property.... Blackstone deemed "the most universal relation in nature ... (to be) that between parent and child." 1 W. Blackstone, *Commentaries* * 446.

*Id.* at 1372–73. The Utah Supreme Court views the right of a parent to maintain the relationship with a child as axiomatic: "The integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo American culture, presupposed by all our social, political, and legal institutions."

This parental right transcends all property and economic rights. It is rooted not in state or federal statutory or constitutional law, to which it is logically and chronologically prior, but in nature and human instinct. Thus, the United States Supreme Court has declared that "the liberty interest in family privacy has its source ... in intrinsic human rights...." *Smith v. Organization of Foster Families*, 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977).... Similarly, this Court has stated that the parent's right, as well as duty, to care for a child "may be termed natural, as well as legal and moral." *Mill v. Brown*, 31 Utah 473, 483, 88 P. 609, 613 (1907). More recently, this Court has spoken of "the natural right and authority of the parent to the child's custody," *State in re Jennings*, 20 Utah 2d 50, 52, 432 P.2d 879, 880 (1967), and of "the prior and fundamental right of a parent to rear his child...." *In re Castillo*, 632 P.2d at 856.

*Id.* at 1373–74 (some quotations & citations omitted). *In re J.P.* emphatically reaffirms that "the rights embodied in family relationships are inherent, natural, and retained rights," fundamental in nature, and that " '[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment.' " *Id.* at 1374 (quoting *Stanley v. Illinois*, 405 U.S. at 651, 92 S.Ct. 1208 (citations omitted)).

The question, then, is *not* one of "extending constitutional protection to an asserted right or liberty interest," or being "asked to break new ground in this field," *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258, because the fundamental right to

bear and raise children within the context of a marriage is already clearly established. *See, e.g., Roska v. Peterson,* 304 F.3d 982, 993–94 (10th Cir.2002) (constitutionally protected liberty interest in family relationship between parents and child is clearly established; infringement of that interest by removing child from parents' custody without a hearing constitutes a denial of due process for which qualified immunity was not available); *Carey v. Population Services International,* 431 U.S. at 687, 97 S.Ct. 2010 ("[T]he Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State."); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); *State ex rel. M.W.,* 12 P.3d 80, 83 (Utah 2000) ("The court of appeals correctly stated in its decision that 'the Utah Constitution and the United States Constitution "recognize[ ] and protect[ ] the inherent and retained right of a parent to maintain parental ties to his or her child." ' " (citations omitted)); *Matter of Adoption of B.O.,* 927 P.2d 202, 207 (Utah Ct.App.1996) ("We agree ... that 'a parent has a fundamental right to maintain a relationship with his or her child.' This right is by now well established by both United States and Utah precedent." (citations omitted)); *State in Interest of E.D. v. E.J.D.,* 876 P.2d 397, 400 n. 5 (Utah Ct.App.1994) ("It is well established that the Utah Constitution and the United States Constitution ' "[recognize] and [protect] the inherent right of a parent to maintain parental ties to his or her child." ' " *State ex rel. P.H. v. Harrison,* 783 P.2d 565, 569 (Utah App.1989) (quoting *In re J.P.,* 648 P.2d 1364, 1377 (Utah 1982)); *accord State ex rel. D.W. III v. W.M.,* 856 P.2d 363, 367 (Utah App. 1993).").

Rather, the question is whether the statute unduly burdens the exercise of that right in a fashion that demands a judicial remedy.

## CONFLICT BETWEEN STATUTE AND CONSTITUTION

Where an act of the legislature comes into conflict with the command of the United States Constitution or the constitution of the state of its enactment, there is no question as to the outcome: the statute fails and the constitution prevails. *See, e.g., Younger v. Harris,* 401 U.S. 37, 52, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ("[A] statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution. *Marbury v. Madison,* [5 U.S.] 1 Cranch 137, 2 L.Ed. 60 (1803)."); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 732–33, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) ("neither Congress nor a State can validate a law that denies the rights guaranteed by the Fourteenth Amendment.")

The more difficult question arises in trying to define the nature and extent of the conflict, if indeed a conflict between statute and constitution exists at all. *See, e.g., Connecticut v. Menillo,* 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (no conflict between statute prohibiting abortions and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), as applied to attempted abortion by untrained and unlicensed practitioner).

In the context of reproductive or procreative choice, a state law " 'which imposes an undue burden on the woman's decision' " concerning procreative matters "is unconstitutional.... An 'undue burden is ... shorthand for the conclusion that a

state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman'" seeking to make procreative choices. *Stenberg v. Carhart,* 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (quoting *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion)).[10] "[W]here a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey,* 431 U.S. at 686, 97 S.Ct. 2010. *See Edwards v. Valdez,* 789 F.2d 1477, 1483 (10th Cir.1986) ("If a statute ... infringes upon a fundamental right, it is subject to strict scrutiny and will be sustained only if it is precisely tailored to further a compelling state interest.").

### Plaintiffs' Challenge to Utah Code Ann. § 76–7–204 (1999)

The Utah surrogacy statute, Utah Code Ann. § 76–7–204 (1999), does *not* prohibit use of gestational surrogacy as a procreative method, or deny persons access to that medical technology, in contrast to cases such as *Carey,* in which distribution of nonprescription contraceptives was limited to licensed pharmacists. 431 U.S. at

681–82, 97 S.Ct. 2010. It is uncontroverted that plaintiffs utilized this method to accomplish the birth of twin children, and to that extent, have effectively exercised their rights to procreate.

The question now facing this court is whether the Utah surrogacy statute unduly burdens J.R. and M.R. in the exercise of their procreative and parental rights by denying them the recognition and rights of legal parents to the care and custody of their children because the children were born through gestational surrogacy.[11] Plaintiffs challenge the constitutionality of Utah Code Ann. § 76–7–204(2) and (3),[12] alleging that these provisions "prevent J.R. and M.R. from legally being acknowledged as parents of their own children," even though DNA testing indicates to a presumptive certainty that "J.R. and M.R. are, respectively, the biological mother and father of the twins who are in part the subject matter of this action." (Pltfs' Reply/Response Mem. at 3 ¶¶ 6, 7.)

### Plaintiffs & Utah Code Ann. § 76–7–204(2)

Section 76–7–204(2) declares surrogacy agreements to be unenforceable even when not made for profit or gain as proscribed by § 76–7–204(1). Yet this provision says nothing about whether or not J.R. and

---

10. Both *Stenberg* and *Casey* examine procreative choice in the context of abortion procedures, but offer helpful guidance in this context as well. To give effect to the Fourteenth Amendment's guarantee of "the equal protection of the laws," the constitution's protection of procreative choice must be at least as vigorous when a woman decides to give birth to a child as when she decides not to do so. U.S. Const., Amend. XIV, § 1. A state-imposed burden on affirmative procreative choice must therefore withstand the same degree of scrutiny as a state-imposed burden on the choice to seek an abortion.

11. In this case, conception occurred and gestation began in California, a state that recognizes gestational surrogacy as a lawful

procreative procedure. The State of Utah's concern under § 76–7–204 in this case is with the end result of that procedure, the live birth, care and custody of two children who are the genetic and biological offspring of J.R. and M.R.

12. In their reply memorandum, plaintiffs concede that they lack standing to challenge the "contract for profit or gain" provisions of Utah Code Ann. § 76–7–204(1) (1999) because "plaintiffs did not enter in to a surrogacy 'contract for profit or gain.'" (Pltfs' Reply/Resp. Mem. at 2 ¶ 2.) They also acknowledge that their Agreement "recites sufficient mutual promises to form a binding contract." (*Id.* at 5.) *See* note 5, *supra.*

M.R. may be "legally ... acknowledged as parents of their own children." That question falls outside of the terms of the parties' Agreement, be it enforceable or not.

The court has reviewed the Complaint with some care, and it appears that none of the relief sought by plaintiffs in this action involves the actual enforcement of any of the terms of the plaintiffs' Agreement against any party. The Agreement reflects a mutual exchange of promises between J.R. and M.R. on the one hand, and W.K.J. on the other. All three parties to the Agreement are aligned as *plaintiffs* in this action, and none of them have alleged any controversy arising out of the terms of their Agreement.[13]

Absent some genuine issue concerning the enforcement of the plaintiffs' Agreement, the plaintiffs lack standing to challenge § 76–7–204(2) because they have alleged no injury in fact resulting from the application or enforcement of this statutory provision. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("plaintiff must have suffered an injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent", not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly trace[able] to the challenged action of the defendant, ..." (citations omitted)); *Z.J. Gifts D–4, L.L.C. v. City of*

*Littleton*, 311 F.3d 1220, 1226 (10th Cir. 2002).

**Utah Code Ann. § 76–7–204(3)(a) & Determination of Parental Rights**

As noted above, Utah Code Ann. § 76–7–204(3)(a) provides that "the surrogate mother is the mother of the child for all legal purposes, and her husband, if she is married, is the father of the child for all legal purposes." In contrast to § 76–7–204(2), this provision may bear directly upon the question whether J.R. and M.R. may be "legally ... acknowledged as parents of their own children." (Pltfs' Reply/Resp. Mem. at 3 ¶ 7.) Plaintiffs have alleged the requisite "injury in fact" that affords them standing to pursue their constitutional challenge to this statutory presumption.

Defendants' counsel submits that § 76–7–204(3)(a) was enacted to ensure that whatever else may happen, a child born of a surrogacy arrangement comes into the world with at least one easily identifiable legal parent and guardian-the birth mother-and thus cannot be orphaned at birth at the whim of the genetic parents. (Defs' Mem. at 14–16 (citing John J. Mandler, *Developing a Concept of the Modern Family: A Proposed Uniform Surrogate Parenthood Act*, 73 Geo. L.J. 1283, 1285–86 (1985)).)[14] However, where the genetic/biological parents actively assert their rights and interests in the child and seek full custody of the child, the State's concern about orphanage largely dissipates.

---

13. This case stands in striking contrast to the prior reported cases dealing with surrogacy issues, many of which involved a custody dispute between surrogate mother and a genetic parent. See Annotation, *Determination of status as legal or natural parents in contested surrogacy births*, 2000 WL 511488, 77 A.L.R. 5th 567 (2000), and cases discussed therein; *Johnson v. Calvert*, 5 Cal.4th 84, 19 Cal. Rptr.2d 494, 851 P.2d 776 (1993); *In re Baby M*, 109 N.J. 396, 537 A.2d 1227, 1253, 77 A.L.R.4th 1 (1988).

14. Ironically, as plaintiffs point out, if § 76–7–204 is enforced according to its terms, "neither the surrogate nor the state can force the biological or intended parents to take responsibility for the child they formerly wanted and helped create." (Pltfs' Reply/Resp. Mem. at 15.) Recognition of the genetic/biological parents' relationship to the child born to the surrogate, on the other hand, brings with it parental *responsibilities* as well as parental rights.

If, even in that setting, Utah Code Ann. § 76–7–204(3)(a) applies to preclude either the assertion by J.R. and/or M.R. of their parental relationship with the children they have conceived or the recognition of J.R. and M.R. as legal parents of the children, then at that point, the law takes flight from the facts and plaintiffs' fundamental right to procreate and to maintain family relations may be unduly burdened.[15]

### Construction of Utah Code Ann. § 76–7–204(3)(a)

The Utah surrogacy statute was first enacted in 1989, following on the heels of the controversial "Baby M" litigation in the courts of the State of New Jersey. *See In re Baby M*, 109 N.J. 396, 537 A.2d 1227, 77 A.L.R.4th 1 (1988). The Legislature likely was concerned about the protection of the procreative rights of birth mothers who conceived children through artificial insemination pursuant to contracts under which they agreed in advance to forfeit their parental rights to their own genetic/biological/birth children in favor of the genetic/biological father with whom they had agreed, much like the circumstances of *Baby M*. Legislatures in nearly half of the states enacted similar measures at about the same time. *See, e.g.*, Lori Andrews, *Beyond Doctrinal Boundaries: A Legal Framework for Surrogate Motherhood*, 81 Va. L.Rev. 2343, 2346–49 (1995).

As plaintiffs point out, however, medical technology has moved beyond artificial insemination and traditional surrogacy[16] to the viable implantation of embryos fertilized *in vitro* using ova and sperm cells from the "intended parents," *not* the surrogate birth mother. To the extent that the meaning of a statute is defined by the problem that it was designed to remedy,[17] it may be that the Utah surrogacy statute simply did not contemplate the unique interplay of interests involved in the implantation of live embryos in the womb of a genetic stranger, in contrast to the more conventional dispute between the genetic/biological birth mother and genetic/biological father in the *Baby M* case.[18]

A narrowing construction[19] of § 76–7–204(3)(a) that would limit its application to

---

**15.** This circumstance is not the one presented in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), in which a plurality of the Court upheld a California statute that established an irrebuttable presumption that a child born to a married woman living with her husband, who is neither impotent nor sterile, is a child of the marriage, observing that the presumption furthered "our traditions" that "have protected the marital family against the sort of claim" asserted by Michael H., a stranger to the marriage who asserted paternity of the couple's child, Victoria. 491 U.S. at 124, 109 S.Ct. 2333 (Scalia, O'Connor, Kennedy, JJ. & Rehnquist, C.J.).

**16.** "Traditional surrogacy," in which the surrogate mother contributes her own ova to the effort along with carrying the pregnancy to term and giving birth, is not new; as a procreative method, it has been known for centuries. *See, e.g.*, Genesis 16:1–4, 15; 30:1–10.

**17.** *Elliot Coal Min. Co., Inc. v. Director, Office of Workers' Compensation Programs*, 17 F.3d 616, 631 (3rd Cir.1994) ("additional support for our parsing of the text of the Act … can be found in the 'mischief' rule, discussed in the venerable *Heydon's Case,* 76 Eng. Rep. 637 (Ex.1584). That canon of construction directs a court to look to the 'mischief and defect' that the statute was intended to cure. *Id.* at 638.")

**18.** Indeed, "Most surrogacy laws assume that the 'surrogate' birth mother is genetically related to the child; they thus fail to address the increasingly common phenomenon of gestational surrogacy." Garrison, *Law Making for Baby Making, supra*, at 852.

**19.** It is well settled that federal courts have the power to adopt narrowing constructions of federal legislation. *See, e.g., New York v. Ferber*, 458 U.S. 747, 769, n. 24, 102 S.Ct. 3348, 3361, n. 24, 73 L.Ed.2d 1113 (1982); *United States v. Thirty-Seven Photographs,*

surrogate birth mothers who have contributed their own genetics to the conception of the child would obviate the application of the statutory presumption to cases of true gestational surrogacy—such as this one—and avoid any conflict with the fundamental rights of genetic/biological parents such as J.R. and M.R.

■ "It is well-settled that a federal court must uphold a statute if it is ' "readily susceptible" to a narrowing construction that would make it constitutional. . . . ' " *Citizens for Responsible Government State Political Action Committee v. Davidson,* 236 F.3d 1174, 1194 (10th Cir.2000) (quoting *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)).

The key to application of this principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements. *American Booksellers,* 484 U.S. at 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (citations omitted, emphasis added). Even the Supreme Court is "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 2616, 147 L.Ed.2d 743 (2000) (quotations and citations omitted); *see also Almendarez–Torres v. United States,* 523 U.S. 224, 238, 118 S.Ct. 1219, 140 L.Ed.2d

402 U.S. 363, 368–370, 91 S.Ct. 1400, 1404–1405, 28 L.Ed.2d 822 (1971). Indeed, the federal courts have the duty to avoid constitutional difficulties by doing so if such a construction is fairly possible. *See, e.g., Ferber, supra,* 458 U.S. at 769 n. 24, 102 S.Ct. at 3361 n. 24; *Thirty-Seven Photographs, supra,* 402 U.S. at 369, 91 S.Ct. at 1404; *Schneider v. Smith,* 390 U.S. 17, 26 27, 88 S.Ct. 682, 687–688, 19 L.Ed.2d 799 (1968).

*Boos v. Barry,* 485 U.S. 312, 330–31, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). *See also NLRB*

350 (1998) (statute must be "genuinely susceptible" to narrowing construction); *City of Houston v. Hill,* 482 U.S. 451, 468, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ("fairly" or "obviously susceptible"); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) ("easily susceptible").

*Id.*

Weighing *against* a narrowing construction of § 76–7–204(3)(a) is its reference to "any case arising under Subsection (1) or (2)"; both subsections (1) & (2) refer to "a woman [who] agrees to undergo artificial insemination or *other procedures* " resulting in the birth of a child. Utah Code Ann. § 76–7–204(1), (2) (1999) (emphasis added). The "artificial insemination or other procedures" language of § 76–7–204(1) & (2) thus defines the class of persons who are affected by § 76–7–204(3)(a). Nothing in § 76–7–204 further defines the scope or expanse of the phrase "or other procedures," or indicates whether it was intended to cover gestational surrogacy or not.

Plaintiffs submit that there is *no* legislative history available for Utah Code Ann. § 76–7–204, and they point out that the legislative materials cited by defense counsel refer to the substance of other legislative proposals that were *not* enacted. (Pltfs' Reply/Resp. Mem. at 11–12; *see*

*v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937) ("The cardinal principle of statutory construction is to save and not to destroy."). To some extent, this duty extends to state statutes as well. *See, e.g., Erznoznik v. Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"); *Frisby v. Schultz,* 487 U.S. 474, 482, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

Exhibits re: Legislative History, filed September 17, 2002 (dkt. no. 48).)

Neither plaintiffs nor the Attorney General have suggested a narrowing construction of the statute as a means of avoiding the alleged clash of constitution and statute in this case.[20] This court is reluctant to impose a narrowing construction *sua sponte*, at least in the absence of interpretive aids such as legislative history that support such a reading of the statute's plain language.[21] Given its ordinary meaning, the phrase "artificial insemination *or other procedures*" appears to contemplate medical procedures beyond or in addition to the artificial insemination utilized in *Baby M*, including *in vitro* fertilization-a procedure that was available by 1989 when the statute was passed.[22] A narrowing construction must be rejected if it "conflicts with the statutory language," *Stenberg*, 530 U.S. at 942, 120 S.Ct. 2597, as it appears that it would in this instance.

### Fundamental Rights vs. Compelling Interests

■ To the extent that Utah Code Ann. § 76–7–204(3)'s declaration that "the sur-

rogate mother is the mother of the child for all legal purposes, and her husband, if she is married, is the father of the child for all legal purposes" may be read to limit or even preclude the assertion of parental rights or interests by the genetic/biological father or mother of the child, the genetic/biological parents' constitutionally protected rights have been burdened by the statute. Absent a compelling state interest justifying that burden,[23] a finding that § 76–7–204(3) is unconstitutional as applied becomes "strictly unavoidable" if the genetic/biological parents' fundamental rights—and the constitutions that guarantee them—are to be vindicated.

### The State's "Compelling Interests"

That gestational surrogacy implicates J.R. and M.R.'s fundamental rights does not mean that all other interests instantly give way, or that the State has nothing to say about the process. The gestational carrier surrogate is still the birth mother of the child, with at least some legally protected interests. The State asserts ongoing interests in protecting the health, safety and welfare of both the birth moth-

---

**20.** Counsel for the defendants recites that "it is a basic rule of construction . . . to construe the statute in such a way as to avoid the conclusion that it is unconstitutional," (Defs' Mem. at 3), but does not suggest a narrowing construction of § 76–7–204(3)(a) that would avoid the constitutional problem.

**21.** Commentators viewing the Utah surrogacy statute in the context of other state statutes involving surrogacy have read § 76–7–204 as embracing gestational surrogacy as well as surrogate parentage of the kind addressed in *Baby M. See, e.g.,* Adam P. Plant, Commentary, *with a Little Help from My Friends: the Intersection of the Gestational Carrier Surrogacy Agreement, Legislative Inaction, and Medical Advancement,* 54 Ala. L.Rev. 639, 650 & n. 77 (2003). At the same time, one author suggests that "if a state uses an alternate statutory construction that avoids the problems presented in" cases such as *Soos v. Superior Court,* 182 Ariz. 470, 897 P.2d 1356

(1994), then the prohibition of surrogacy contracts "could potentially be upheld." *Id.* at 651. Construing § 76–7–204(3)(a) as applying only to genetic/biological surrogate mothers would avoid the equal protection problem raised in *Soos* under a statute that prevented the genetic/biological mother from establishing her own maternity apart from the gestational surrogate.

**22.** The first *in vitro* fertilization birth occurred in 1978 in the United Kingdom. Garrison, *supra,* at 848 & n. 56.

**23.** "While the Court has not described the exact parameters of the right to maintain family relationships, it clearly has indicated that regulation of these relationships must be justified by an overriding state interest." 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.28, at 584–85 (3d ed.1999) (footnote omitted).

er and the child born of that pregnancy, whatever the child's genetic origins may be. Indeed, defense counsel asserts that the State's legitimate—even compelling—interests include (1) protecting the best interests of the child born through gestational surrogacy;[24] (2) avoiding complicated and unsettling custody disputes; (3) protecting the surrogate birth mother's physical health and emotional well being, and her interest in a relationship with the child she had borne; (4) preventing the exploitation of women, particularly through surrogacy-for-profit arrangements; and (5) preventing children from becoming "commodities" to be purchased and sold. (Defs' Mem. at 12–23.)

### "The Best Interests of the Child"

Defendants argue that "the best interest of the child [is] a sufficiently compelling interest to justify government intrusion into a person's fundamental, but qualified right to procreate," particularly when "sur-

rogacy contracts avoid any objective determination of the best interest of the child." (*Id.* at 14 (citing *Doe v. Attorney General,* 194 Mich.App. 432, 487 N.W.2d 484, 486–87 (1992)).) Plaintiffs respond that § 76–7–204(3)'s conclusive presumption that the gestational surrogate (and her spouse, if any) is the legal parent of the child also "avoids any objective determination of the best interest of the child," contrary to the defendants' assertion that "those interests must be paramount." (Pltfs' Reply/Resp. Mem. at 14.)

The question of "the best interests of the child" proves inescapably fact-driven.[25] Yet § 76–7–204(3) requires *no* fact-finding to decide that it is in "the best interest of the child" in *all* instances for the gestational surrogate birth mother to be deemed the legal parent of the child—regardless of the circumstances of the genetic/biological parents who actually conceived the child—and to do so without a

---

24. The defendants assert that

> [i]f enforceable, surrogacy contracts would permit the intending parents, whose motivations for entering into the contract are driven by their desire to have and raise a child, to unilaterally and irrevocably determine the parentage and custody of the child or children born through such an arrangement.... Contrary to Utah law and public policy, however, this determination is made without considering whether the intending parents are "financially able and morally fit to have the care, supervision and training of the child."

(Defs' Mem. at 16 (quoting Utah Code Ann. § 78–30–9 (2002)).) Of course, for the many married couples that choose to conceive and bear a child *without* relying on a gestational surrogate, these considerations are routinely entrusted to their own judgment, without any state intervention.

25. Utah courts speak of "those numerous factors which must be weighed in determining the 'best interests of the child.'" *Smith v. Smith,* 726 P.2d 423, 425 (Utah 1986); *see, e.g., Hutchison v. Hutchison,* 649 P.2d 38 (Utah 1982):

> Some factors the court may consider in determining the child's best interests relate primarily to the child's feelings or special needs: the preference of the child; keeping siblings together; the relative strength of the child's bond with one or both of the prospective custodians; and, in appropriate cases, the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted. Other factors relate primarily to the prospective custodians' character or status or to their capacity or willingness to function as parents: moral character and emotional stability; duration and depth of desire for custody; ability to provide personal rather than surrogate care; significant impairment of ability to function as a parent through drug abuse, excessive drinking, or other cause; reasons for having relinquished custody in the past; religious compatibility with the child; kinship, including, in extraordinary circumstances, stepparent status; and financial condition. (These factors are not necessarily listed in order of importance.)

*Id.* at 42 (footnotes omitted).

hearing. In every instance, it finds the fact of parenthood from the fact of childbirth. In the context of gestational surrogacy, § 76–7–204(3) serves as "an irrebuttable presumption often contrary to fact," lacking "critical ingredients of due process...." *United States Dept. of Agriculture v. Murry*, 413 U.S. 508, 514, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973).[26]

Utah Code Ann. § 76–7–204(3)(a) operates in *every* instance to abrogate the parental rights and interests of genetic/biological parents at the moment of their child's birth, without any prior opportunity for hearing on the merits of those rights and interests *vis-a-vis* the "best interests of the child"-an obviously inappropriate result in any other context, even in dealing with children born out of wedlock. *See Stanley v. Illinois*, 405 U.S. at 654–59, 92 S.Ct. 1208 (striking down state's irrebuttable statutory presumption that all unmarried fathers are not qualified to raise their children; hearing on the merits required); *Caban v. Mohammed*, 441 U.S. 380, 388–94, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (invalidating statute which requires consent of the mother of a child born out of wedlock to adoption, but denied the same right to the father of the child); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (requiring proof by no less than clear and convincing evidence to justify termination of parental rights).[27]

The Utah Supreme Court has already determined that under both the United States Constitution and the Utah Constitution, the Legislature may not predetermine that "the best interests of the child" alone warrant the involuntary abrogation of parental rights where there has been no adjudication of a parent's unfitness, or a showing of abandonment or substantial neglect. "[T]hat the child's welfare is the 'paramount consideration'" does not "imply that the child's welfare is the sole consideration, to the exclusion of parental rights." *In re J.P.*, 648 P.2d at 1377.

*In re J.P.* amplified *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), in which a unanimous Court underscored the constitutional inadequacy of a finding of a "child's best interest" as the sole means of overriding the constitutional right of parents who have not been shown to be unfit, echoing the observation in *Stantosky* that the State's "interest favors preservation, not severance, of natural familial bonds," at least "while there is still reason to believe that positive, nurturing parent-child relationships exist." 455 U.S. at 766–67, 102 S.Ct. 1388.[28]

**26.** As one commentator cogently observes, "A so-called presumption which cannot be rebutted by evidence is not a presumption but a rule of substantive law." Michael H. Graham, *Handbook of Federal Evidence* § 301.9, at 106 (3d ed.1991). Indeed, "[t]he use of the terms irrebuttable and conclusive presumption, referring solely to rules of law and not presumptions, should be discontinued as useless and confusing." *Id.* (footnote omitted).

**27.** Reasoning that "a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right," 455 U.S. at 758–59, 102 S.Ct. 1388 (internal quotation marks omitted) the *Santosky* Court required a standard of proof that "reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Id.* at 755, 102 S.Ct. 1388.

Under the conclusory rule of § 76–7–204(3)(a), the risk of error falls entirely upon the genetic/biological parents.

**28.** The defendants' assertion that § 76–7–204(3)(a)'s parentage rule protects the child against abandonment by his genetic/biological parents presupposes that "positive, nurturing parent-child relationships" will *not* exist between the genetic/biological parents and the child they have gone to such great lengths to produce. This seems counter-intuitive, at minimum, and clearly does not correspond to the facts in this case.

The parent-child relationship is a *fact*—one having legal significance and legal consequences, but a fact nonetheless. Parenthood is *not* brought into being by the operation of state or federal law. It arises from the conception and birth of children. Parenthood differs from, say, the privilege to form a corporation, or to distribute one's property by will, or to drive an automobile, because the parent-child relationship finds its source not in a legislative act, but in the facts of life itself.

Childbirth makes parents of ordinary persons. The Legislature does not.

This parental right transcends all property and economic rights. It is rooted not in state or federal statutory or constitutional law, to which it is logically and chronologically prior, but in nature and human instinct. Thus, the United States Supreme Court has declared that "the liberty interest in family privacy has its source ... in intrinsic human rights...." *Smith v. Organization of Foster Families*, 431 U.S. 816, 845, 97 S.Ct. 2094, 53 L.Ed.2d 14, ...

*In re J.P.*, 648 P.2d at 1373.[29] *See also Belsito v. Clark*, 67 Ohio Misc.2d 54, 644 N.E.2d 760 (1994) (the natural parents of a child conceived through *in vitro* fertilization and born to a gestational surrogate are the persons who have provided the "genetic imprint" for that child, unless they have affirmatively relinquished their rights).

The parent-child relationship between J.R. and M.R. and the children born to

W.K.J. likewise remains an uncontroverted genetic and biological *fact.* The Legislature cannot overcome that fact (or the fundamental interests that arise from that fact) using the simplistic device of a conclusive presumption that the fact does not exist. And "the State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley v. Illinois*, 405 U.S. at 652, 92 S.Ct. 1208.

*In re J.P.* left no doubt that the Legislature cannot elect to end a parent's relationship with a child by "substitut[ing] a finding of 'the child's best interest' for a finding that a parent is 'unfit or incompetent' as a basis for the involuntary termination of parental rights." 648 P.2d at 1377–78. *See State in Interest of G.D. v. L.D.*, 894 P.2d 1278 (Utah Ct.App.1995) ("In fact, it is unconstitutional to terminate a parent's rights based upon a finding of the best interests of the child without first finding that the parent is below some minimum threshold of fitness. *In re J.P.*, 648 P.2d 1364, 1374–77 (Utah 1982).")[30]

States must "provide the parents with fundamentally fair procedures" protecting against improper termination of the parent-child relationship, *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388, including parent-child relationships between genetic/biological mothers and fathers and children born through gestational surrogacy. The State's concern for the "best interests of the child," however compelling it may be,

---

**29.** What a far different experience life would be if the State undertook to issue children to people in the same fashion that it now issues driver's licenses. What questions, one wonders, would appear on the written test?

**30.** Yet that appears to be exactly what § 76–7–204(3)(*b*) tries to do:

(b) In any custody issue that may arise under Subsection (1) or (2), the court is not bound by any of the terms of the contract or

agreement but shall make its custody decision based *solely on the best interest of the child.*

Utah Code Ann. § 76–7–204(3)(b) (emphasis added). It would seem exceedingly difficult to sustain this provisions in light of *In re J.P.* and its progeny. However, because there is no "custody issue" arising under the Agreement between the parties to this action, the court need not decide the validity of § 76–7–204(3)(b) at this time.

cannot sustain a legislative act that would summarily rewrite the facts of parenthood to suit legislative preferences as to matters of public policy.

### Protection of the Surrogate Mother

Defendants also assert that Utah Code Ann. § 76–7–204 protects the surrogate birth mother's physical health and emotional well being, and that § 76–7–204(3)(a) protects her interest in a relationship with the child to whom she has given birth by deeming her in every instance to be "the mother of the child for all legal purposes," whether she desires to be or not. Plaintiffs object that this is "forcing parenthood" upon someone who does not want it, someone who has given birth to another couple's child solely to assist them in building their family.[31]

The California Supreme Court in *Johnson v. Calvert,* 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, *cert. denied,* 510 U.S. 874, 114 S.Ct. 206, 126 L.Ed.2d 163, *and cert. dismissed,* 510 U.S. 938, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993), acknowledged that both the genetic/biological mother and the gestational surrogate birth mother had submitted credible evidence of a mother and child relationship under California's version of the Uniform Parentage Act.[32] Given those relationships, the court turned to the intent of the parties to the surrogacy agreement to determine that the natural and legal parents of the child were those who intended to bring about the birth and raise the child as their own-the

genetic/biological mother and father. However, the court rejected the claim that the gestational surrogate was exercising "her own right to make procreative choices; she is agreeing to provide a necessary and profoundly important service without (by definition) any expectation that she will raise the resulting child as her own." 19 Cal.Rptr.2d 494, 851 P.2d at 787. To the *Calvert* court, the choice to gestate and deliver a baby for the genetic parents pursuant to a surrogacy agreement is not the constitutional equivalent of the decision whether to bear a child of one's own; "any constitutional interests [the gestational surrogate] possesses in this situation are something less than those of a mother." *Id.* at 786.

However, this court is not prepared to say that a surrogate birth mother—even a surrogate birth mother who is a genetic stranger to the child born to her—is not exercising her fundamental rights, *viz.,* her right to procreate and to make her own decisions about reproduction (*e.g.,* whether to terminate or continue a pregnancy), or that she has no legally protected interest in her relationship to the child she has carried to term and to whom she in fact gave birth.

Pregnancy and childbirth have physiological and psychological impacts upon the person experiencing the pregnancy and giving birth to the child, whatever the genetic particulars may be. Life is process, and this extraordinary process of hu-

---

**31.** *Cf. Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Blackmun, J., concurring in part) ("This assumption-that women can simply be forced to accept the 'natural' status and incidents of motherhood—appears to rest upon a conception of women's role that has triggered the protection of the Equal Protection Clause. *See, e.g., Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724–726, 102 S.Ct. 3331, 3336–3337, 73 L.Ed.2d 1090 (1982); *Craig v. Boren,*

429 U.S. 190, 198–199, 97 S.Ct. 451, 457–458, 50 L.Ed.2d 397 (1976)." (footnote omitted)).

**32.** The gestational surrogate birth mother contended that she was the mother by reason of having given birth to the child, *see* Cal. Civil Code § 7003; the genetic parents contended that their paternity/maternity was established by blood tests, *see* Cal. Civil Code § 7015.

man childbirth implicates the fundamental procreative rights of the birth mother as well as those of the mother and father whose best efforts at procreation have furnished the embryo. *See, e.g., A.H.W. v. G.H.B.,* 339 N.J.Super. 495, 772 A.2d 948, 952–54 (2000); Alayna Ohs, Note, *The Power of Pregnancy: Examining Constitutional Rights in a Gestational Surrogacy Contract,* 29 Hastings Const. L.Q. 339, 355–61 (2002) (gestational surrogacy implicates fundamental procreative rights of surrogate mother).

The question becomes whether § 76–7–204(3)(a)'s parentage rule is "narrowly tailored" to serve the State's compelling interest in protecting the interests of the gestational surrogate in her own pregnancy and her relationship with the child, taking into consideration the burden imposed upon the fundamental procreative and parental rights of the genetic/biological parents. *See, e.g., Glucksberg,* 521 U.S. at 721, 117 S.Ct. 2258 ("the Fourteenth Amendment 'forbids the government to infringe ... "fundamental" liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" (quoting *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)) (emphasis in original)); *see also Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.")

If accorded conclusive effect, § 76–7–204(3)(a) "could hardly be described as narrowly tailored." *Citizens for Responsible Government State Political Action Committee v. Davidson,* 236 F.3d at 1199. The statute establishes the surrogate's parental rights to the exclusion of the genetic/biological mother, and if the surrogate is married, to the exclusion of the genetic/biological father as well.[33] No fact-specific determination of the relative fitness of the surrogate or the genetic/biological parents is required. Instead, § 76–7–204(3)(a)'s self-operative parentage rule supplants the parental rights of the genetic/biological parents by putting the surrogate (and her spouse, if any) in their place, regardless of the particular facts and circumstances surrounding each surrogacy arrangement.[34]

**The State's Other Interests**

The remaining interests asserted by the State either are not "compelling" (*e.g.,* "avoiding complicated and unsettling custody disputes"), or involve facts not presented in this case (*viz.,* exploitation of women through surrogacy-for-profit contracts, or children becoming commodities). (Defs' Mem. at 12–23.)

Even assuming that the State has compelling interests in avoiding surrogacy for profit, Utah Code Ann. § 76–7–204(3)(a) cannot be said to be narrowly tailored to serve these interests because it affects *all* surrogate births, not just those entered into for profit or financial gain. No one has alleged that W.K.J.'s surrogacy was entered into for profit or gain; there is no allegation that W.K.J. has been "exploited" in some fashion, or that her interest in the children has been unfairly overborne in favor of the genetic/biological parents; and

---

**33.** In doing so, the § 76–7–204(3)(a) presumption may collide with the existing rule of Utah law that as "between a natural parent and a nonparent, we begin with the presumption that placing a child with his or her natural parent is in the child's best interests." *State of Utah in the Interest of J.M.,* 940 P.2d 527, 530 (Utah Ct.App.1997).

**34.** Plaintiffs suggest that "[n]arrowly tailored alternatives are readily available," such as judicial oversight of surrogacy arrangements or a post-natal proceeding for "a judicial acknowledgment of parentage." (Pltfs' Reply/Resp. Mem. at 17.)

none of the uncontroverted facts of this case even hints that the two children conceived by J.R. and M.R. and borne by W.K.J. have been treated as a *commodity* (*i.e.*, "anything bought or sold; any article of commerce" [35]), by anyone. Yet defendants assert that § 76–7–204(3)(a) applies to define the parental rights of W.K.J., J.R. and M.R. no less than it would in the case of a blatant surrogacy-for-profit scheme.

Utah Code Ann. § 76–7–204(3)(a) burdens the fundamental parental rights of J.R. and M.R. by attempting to abrogate them through substitution of another legal parent, and that burden cannot be justified as serving these asserted "compelling interests," particularly where they have very little bearing upon the uncontroverted facts of this case.

**Conclusive Effect & "Undue Burden"**

In the context of gestational surrogacy, Utah Code Ann. § 76–7–204(3)(a) establishes a rule of substantive law that genetic/biological parents—particularly genetic/biological *mothers* who are not the birth mother—are not qualified to raise their children and declares that they will have *no* parental rights or legal relationship as a parent with the children they have conceived. It mandates that the surrogate mother "is the mother of the child for all legal purposes, and her husband, if she is married, is the father of the child for all legal purposes," to the exclusion of the child's natural parents.

In doing so, § 76–7–204(3)(a) places a substantial obstacle in the path of a woman in J.R.'s position who is seeking to make procreative choices, *Stenberg*, 530 U.S. at 921, 120 S.Ct. 2597 (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion)), and to bear and raise her own children, unduly burden-

ing the exercise of her fundamental rights. Indeed, when the State undertakes to extinguish parental rights, "it seeks not merely to infringe that fundamental liberty interest, but to end it. 'If the State prevails, it will have worked a unique kind of deprivation.... A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.'" *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (quoting *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).

This blanket presumption is not narrowly tailored to serve the State's compelling interests in safeguarding the best interests of the child and the health, safety and procreative interests of the surrogate mother. It may be that some genetic/biological parents are unsuited to have custody of children, and in those instances, the exercise of parental rights may not be in the best interests of the child. But certainly many natural parents "are not in this category; some are wholly suited to have custody of their children," *Stanley v. Illinois*, 405 U.S. at 654, 92 S.Ct. 1208 (footnote omitted), and at minimum, the Due Process Clause requires the State to provide them with a fundamentally fair hearing on that question before depriving them of legal parenthood of their own children. *Id.* at 654–58, 92 S.Ct. 1208. As the Utah Supreme Court has explained,

> [W]e conclude that the Utah Constitution recognizes and protects the inherent and retained right of a parent to maintain parental ties to his or her child under Article I, § 7 and § 25, and that the United States Constitution recognizes and protects the same right under the Ninth and Fourteenth Amendments. We further conclude that, under both Constitutions, a mother is entitled to a showing of unfitness, abandonment, or

**35.** *Webster's New World Dictionary* 281 (3d. coll. ed.1991).

substantial neglect before her parental rights are terminated.

*In re J. P.,* 648 P.2d at 1377. Utah Code Ann. § 76–7–204(3)(a) requires no such showing on a fact-specific, case-by-case basis; it cannot be rebutted by evidence of the genetic/biological fact of parenthood, and thus cannot satisfy the requirements of Due Process.

### Can Adoption Relieve the Statutory Burden on Plaintiffs' Rights?

Counsel for the defendants argues that the plaintiffs may gain the legal rights and status of parents of the children they conceived by pursuing the matter through a Utah State adoption proceeding, and any burden on their procreative and parental rights is thereby relieved:

> More than twenty-four hours have passed since the birth of the twins (Utah Code Ann. § 78–30–4.19) and WKJ has the absolute legal right to irrevocably (Utah Code Ann. § 78–30–4.20) consent to their adoption by J.R. and M.R. pursuant to Utah Code Ann. § 78–30–4.14. Once she has done so, JR and MR can petition either the district or juvenile court for a decree of adoption. Utah Code Ann. § 78–30–7. Approval of such a petition would be subject only to a home study of their ability to financially and morally care for the children. Utah Code Ann. § 78–30–14.

(Defs' Mem. at 7–8.) The availability of the adoption process, counsel continues, would obviate any need for this court to decide the constitutional questions raised by plaintiffs' challenge to the statute. (*Id.*)

The contemplated adoption proceeding does not require a court to enforce the Agreement itself. As defense counsel suggests, W.K.J. need only agree to the termination of any parental rights she may have in favor of the adoption of the children by J.R. and M.R., and J.R. and M.R. need only present the required petitions and make the required showings that would enable a Utah state court to bring law into harmony with genetics, and grant their adoption of the children that in fact they have conceived. As counsel suggests, completing the anticipated adoption proceedings would produce the result now desired by all of the plaintiffs without running afoul of the restrictions of Utah Code Ann. § 76–7–204.

Plaintiffs concede that the adoption process is available,[36] but argue that resort to adoption should not be required where it is uncontroverted that J.R. and M.R. are the genetic/biological parents of the children born to W.K.J. (Pltfs' Reply/Resp. Mem. at 17 n. 4 ("That they must adopt their own children rankles biological parents of a gestational surrogacy. The possibility that in an adoption the court could deny them parenthood of their own children is troublesome.").) J.R. and M.R.'s fundamental interests in parenting the children they have conceived would be burdened by the requirements of the adoption process, and by the risk, however remote, that a finding of the best interests of their children could be adverse to J.R. and M.R., resulting in a denial of parental rights.

Other courts considering the question of surrogacy in the context of adoption proceedings have found that "[g]estational surrogacy differs in crucial respects from adoption and so is not subject to the adoption statutes." *Johnson v. Calvert,* 5

---

**36.** That an adoption proceeding may be required to conclusively establish J.R. and M.R.'s parental relationship to the children was expressly contemplated by these parties, as plainly reflected in the second paragraph of the Agreement: "the parties have been advised that under Utah law, it is illegal for any party to profit or gain from a surrogacy arrangement and that *an adoption may be required to establish the intended parents as the legal parents* of the surrogate child." (Agreement at 1 (emphasis added).)

Cal.4th at 96, 19 Cal.Rptr.2d 494, 851 P.2d at 784. In *Culliton v. Beth Israel Deaconess Medical Center,* 435 Mass. 285, 291, 756 N.E.2d 1133, 1138 (2001), the Massachusetts Supreme Court distinguished gestational surrogacy from traditional surrogacy, in which the birth mother also contributed her own genetics, and concluded that "[a]s is evident from its provisions, the adoption statute was not intended to resolve parentage issues arising from gestational surrogacy agreements." The Utah appellate courts have yet to address this question.

Utah Code Ann. § 76–7–204(4) provides that "[n]othing in this section prohibits adoptions and adoption services that are in accordance with the laws of this state," at least implying that the parent-child relationships presumed to exist under § 76–7–204(3)(a) could be realigned in favor of the child's genetic/biological parents using the State's adoption procedure.

Resort to the adoption process to gain legal recognition of J.R. and M.R.'s parental rights, effective though it might be, still fails to account for the parent-child relationship that already exists in fact between J.R. and M.R. and the twin children they conceived, and thus continues to burden J.R. and M.R.'s fundamental parental rights in the same fashion as § 76–7–204(3)(a).

Parents who bear and raise children in the traditional way need not seek the imprimatur of the State before exercising their rights as parents, or being recognized as such by the law. The State's interest in the child's well-being "favors preservation, not severance, of natural familial bonds," *Santosky,* 455 U.S. at 766–67, 102 S.Ct. 1388, and the same would seem to be true of natural familial bonds

that happened to be aided in their formation through use of medical technology.

**Requirement of a Hearing**

To say that plaintiffs need not resort to traditional adoption procedures to vindicate J.R. and M.R.'s fundamental parental rights does not mean that some form of adjudicative hearing is not required. Given the legally protected interests of both the genetic/biological parents and the gestational surrogate mother, due process would seem to require a hearing in which those interests are examined and reconciled in light of the facts. A finding of genetic consanguinity between intended parents and child, based upon the results of DNA testing or other probative evidentiary facts, would provide a factual footing for formally acknowledging the relationships that exist and serve as the basis for the registration of a supplemental birth certificate reflecting the child's true genetic/biological parentage. At the same time, the surrogate birth mother would be afforded an opportunity to assert whatever interest she may have in her relationship with the children she has borne.[37]

One provision of the State's adoption statute may provide for such a hearing:

> **78–30–4.24. Determination of rights prior to adoption petition.**
>
> Any interested party may petition the court for a determination of the rights and interests of any person who may claim an interest in a child under this chapter, at any time prior to the filing of a petition for adoption, including any time prior to the child's birth.

Utah Code Ann. § 78–30–4.24 (2002).

*Culliton v. Beth Israel Deaconess Medical Center* involved a similar procedure in the Massachusetts courts in which the ge-

---

**37.** If and when the day comes that *in vitro* fertilization is followed by *in vitro* gestation, and ultimately by *in vitro* birth of a live human child, then the interests of the birth

mother will no longer be at issue because no surrogate will be required. Until then, the law will likely continue to protect the procreative rights of everyone involved.

netic/biological parents, joined by the gestational surrogate, sought a prenatal declaration of maternity and paternity as to their unborn twin children, apart from the traditional adoption or paternity procedures. The Massachusetts Supreme Court held that the Probate and Family Court Department had the power to grant the relief they sought:

> Here, where (a) the plaintiffs are the sole genetic sources of the twins; (b) the gestational carrier agrees with the orders sought; (c) no one, including the hospital, has contested the complaint or petition; and (d) by filing the complaint and stipulation for judgment the plaintiffs agree that they have waived any contradictory provisions in the contract (assuming those provisions could be enforced in the first place), we conclude that pursuant to the Probate and Family Court's general equity jurisdiction under G.L. c. 215, § 6, the judge had authority to consider the merits of the relief sought here.

435 Mass. at 291–92, 756 N.E.2d at 1138 (footnote omitted). *Culliton* concluded that the traditional adoption procedure "was not intended to resolve parentage issues arising from gestational surrogacy agreements"; that the statutory paternity procedure "is simply an inadequate and inappropriate device to resolve parentage determinations of children born from this type of gestational surrogacy"; and that the state artificial insemination statute simply "does not apply." *Id.*, 435 Mass. at 290–91, 756 N.E.2d at 1137–38. Instead, *Culliton* looked to the general equity jurisdiction of the court and sought to find a balance between concerns for the best interests of the child and the rights of the genetic/biological parents, who everyone acknowledged to be the parents of the twin children born to the surrogate. The *Culliton* court granted the relief sought by the genetic/biological parents, seeing no need to remand the matter where all parties had entered into a stipulation for the entry of a judgment, and no interested party had raised any objection: "Since the complaint was filed, the twins have been born. It is consequently now appropriate to order the entry of a judgment declaring the plaintiffs the lawful parents of the twins." *Id.*, 435 Mass. at 295, 756 N.E.2d at 1141. A judgment was to be entered "declaring the plaintiffs as the legal parents of the children" and ordering that plaintiffs' names be placed on the applicable records of birth, "listing the plaintiffs as the mother and father, respectively, of the children." *Id.*, 435 Mass. at 296, 756 N.E.2d at 1141.

*Culliston* offers helpful guidance for the satisfactory resolution of the controversy in this case. Entry of an order establishing J.R. and M.R.'s relationship to their twin children through a proceeding under Utah Code Ann. § 78–30–2.24 would afford the legal recognition they seek for their parental relationship with their children, and would furnish a basis for issuance of supplementary birth certificates under Utah Code Ann. § 26–2–10 (1998) [38] listing

---

**38.** Section 26–2–10 provides, in pertinent part:

> **26–2–10. Supplementary certificate of birth.**
> (1) Any person born in this state ... whose parentage has been determined by any U.S. state court ... having jurisdiction, ... may request the state registrar to register a supplementary certificate of birth on the basis of that status.
> (2) The application for registration of a supplementary certificate may be made by

the person requesting registration, if he is of legal age, by a legal representative, or by any agency authorized to receive children for placement or adoption under the laws of this or any other state.
> (3) (a) The state registrar shall require that an applicant submit identification and proof according to department rules....
> (4) (a) After the supplementary certificate is registered, any information disclosed from the record shall be from the supplementary certificate.

J.R. and M.R. as the mother and father of the children.

The only significant obstacle is § 76–7–204(3)(a)'s presumption that W.K.J. is the "mother of the child[ren] for all legal purposes," if that presumption is to be given conclusive effect.

### RELIEF TO WHICH PLAINTIFFS ARE ENTITLED

This court concludes that Utah Code Ann. § 76–7–204(3)(a)'s presumption that W.K.J. as a surrogate mother is the "mother of the child for all legal purposes" cannot lawfully be given preclusive or conclusive effect in the light of evidence that J.R. and M.R. are in fact the genetic/biological parents of the twin children that W.K.J. gave birth to in January of 2000. Giving § 76–7–204(3)(a) any preclusive or conclusive effect with reference to J.R. and M.R. would unduly burden J.R. and M.R.'s fundamental rights of to bear and raise children as guaranteed by both the United States Constitution and the Utah Constitution. That burden is neither necessary to, nor narrowly tailored to serve any compelling State interest; and the statute is not readily susceptible to a narrowing construction that would avoid the collision between this legislative act and the plaintiffs' fundamental rights.

Plaintiffs are entitled to a declaratory judgment that Utah Code Ann. § 76–7–204(3)(a) is unconstitutional as applied to J.R. and M.R. to the extent that § 76–7–204(3)(a)'s rule of parentage would be given preclusive or conclusive effect in any state court proceeding or other setting in which J.R. and M.R. seek legal recognition of their parental relationship with the twin children born to W.K.J. in January, 2000, based upon evidence that J.R. and M.R.

are the genetic/biological parents of the children.

Section 76–7–204(3)(a) may legitimately presume in the first instance that W.K.J., as the birth mother of the twin children born in January of 2000, is their mother, as indeed the law would routinely presume as to *all* birth mothers at the moment of childbirth. Upon presentation of evidence of genetic consanguinity between those children and J.R. and M.R., however, that presumption must dissolve and be given no further force or effect. Otherwise, the effect of the statute would be that of a rule of substantive law denying legal recognition to the uncontroverted fact of J.R. and M.R.'s parentage of the two children, unduly burdening and frustrating J.R. and M.R.'s exercise of their constitutionally guaranteed fundamental rights to maintain that relationship and to raise their own children.

In so ruling, this court simply follows in the footsteps of the Utah Supreme Court in cases such as *In re J.P.*, which eloquently reaffirmed these fundamental rights to bear and raise children in the most emphatic of terms, and held them to be protected by both the United States Constitution and the Utah Constitution. In so ruling, this court also follows decisions of the United States Supreme Court that have consistently "held that the fundamental right of privacy protects citizens against governmental intrusion in such intimate family matters as procreation, childrearing, marriage, and contraceptive choice," cases that "embody the principle that personal decisions that profoundly affect bodily integrity, identity, and destiny should be largely beyond the reach of government." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 926–27, 112 S.Ct. 2791, 120 L.Ed.2d

(b) Access to the original certificate and to the evidence submitted in support of the supplementary certificate are not open to

inspection except upon the order of a Utah district court or as provided under Section 78–30–18.

674 (1992) (Blackmun, J., concurring in part) (citing *Eisenstadt*, 405 U.S. at 453, 92 S.Ct. 1029).

The Court has long held that limitations on these fundamental rights are permissible only if they survive "strict" constitutional scrutiny—that is, only if the governmental entity imposing the restriction can demonstrate that the limitation is both necessary and narrowly tailored to serve a compelling governmental interest. *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The defendants have made no such showing in favor of § 76-7-204(3)(a)'s parentage rule that would justify it being given any conclusive effect.

Application of § 76-7-204(3)(a)'s parentage rule in this case may also run afoul of the Fourteenth Amendment's guarantee of equal protection of the laws, at least to the extent that under Utah law and administrative practice, M.R. can be listed as the father on the birth certificates of the children born to W.K.J., an unmarried woman, but J.R. cannot be listed as their mother. The equal protection problems that arise in that scenario have been examined with some care in *Soos v. Superior Court*, 182 Ariz. 470, 897 P.2d 1356 (1994), which held that a state statute violated the Fourteenth Amendment's Equal Protection Clause when it permitted a genetic/biological father to prove paternity, but did not allow for a genetic/biological mother to prove maternity. Instead, it automatically granted a gestational carrier surrogate the status of legal mother. The *Soos* court concluded that the State's statute affected fundamental liberty interests of parental

rights and thus was subject to a strict scrutiny analysis. *Soos* held that the State had not shown any compelling interest to justify the dissimilar treatment of men and women similarly situated (the biological father and the biological mother of the same child), and therefore, that the statute was unconstitutional. *Id.*, 182 Ariz. at 474–75, 897 P.2d at 1360–61.

This court is satisfied that *Soos* is well reasoned and that its conclusion is sound. The State may not close its eyes to the fact of a parental relationship simply because the parent happens to be a woman. This problem may be avoided, however, if § 76-7-204(3)(a)'s parentage rule is not given any preclusive or conclusive effect.[39]

**Severability of § 76-7-204(3)(a)**

Counsel for the defendants suggests that if a portion of § 76-7-204 is invalidated, the remainder of the statute should stand unaffected. (Defs' Mem. at 31.) Plaintiffs respond that § 76-7-204 contains no "savings clause," that "there is no basis for severability" of § 76-7-204's provisions, and that the entire statute may be "declared to be unconstitutional and invalid." (Pltfs' Reply/Resp. Mem. at 6–7.)

In *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), the Court reversed the facial invalidation of a state statute according to the "normal rule that partial, rather than facial, invalidation is the required course." *Id.* at 504, 105 S.Ct. 2794. Noting that "the same statute may be in part constitutional and in part unconstitutional," the *Brockett* Court held that "if the parts are wholly independent of each other, that which is constitutional may stand while

---

**39.** Plaintiffs assert that the law should do its best to recognize the legal existence of essential human relationships where those relationships exist in actual fact, and that public records, particularly vital records such as birth certificates, should be unfailingly *accurate* in the information they report. Both

parent and child have an interest in having the child's birth certificate reflect their relationship.

The State also has a significant interest in the accuracy of the records it keeps, particularly vital records like birth certificates.

that which is unconstitutional will be rejected." *Id.* at 502, 105 S.Ct. 2794.

More recently, the Tenth Circuit echoed *Brockett* in explaining that "[i]f the language of a statute is not readily susceptible to a narrowing construction, but the unconstitutional language is severable from the remainder of the statute, 'that which is constitutional may stand while that which is unconstitutional will be rejected.'" *Citizens for Responsible Government State Political Action Committee v. Davidson,* 236 F.3d at 1194 (quoting *Brockett,* 472 U.S. at 502, 105 S.Ct. 2794 (internal quotations omitted)).

"In order to determine whether partial invalidation of a state statute is appropriate, federal courts look to state law." *Id.* at 1195 (citing *Brockett,* 472 U.S. at 506–07, 105 S.Ct. 2794); *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam) (severability is an issue of state law). Under Utah law, "When reviewing the construction of statutes, '[t]he general rule is "that statutes, where possible, are to be construed so as to sustain their constitutionality. Accordingly, if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done."'" *State v. Lopes,* 1999 UT 24, ¶¶ 18, 980 P.2d 191 (quoting *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 657 P.2d 1293, 1299 (Utah 1982)). *Gallivan v. Walker,* 54 P.3d 1069, 1098 (Utah 2002).

In determining if an unconstitutional subsection is severable from its umbrella statute, "we look to legislative intent." *Id.* at ¶¶ 19. When the legislature's intent is not expressly stated, we "turn to the statute itself, and examine the remaining constitutional portion of the statute in relation to the stricken portion." *Id.* Upon reviewing the statute as a whole and its operation absent the offending subsection, "[i]f the remainder of the statute is operable and still fur-

thers the intended legislative purpose, the statute will be allowed to stand." *Id.; see also Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 686 (Utah 1985) ("Severability, where part of an act is unconstitutional, is primarily a matter of legislative intent[,] which generally is determined by whether the remaining portions of the act can stand alone and serve a legitimate legislative purpose." (citations omitted, alteration in original)); *Stewart v. Pub. Serv. Comm'n,* 885 P.2d 759, 779–80 (1994); *Union Trust Co. v. Simmons,* 116 Utah 422, 429, 211 P.2d 190, 193 (1949). In *Union Trust Co.,* we further noted that "[t]he test fundamentally is whether the Legislature would have passed the statute without the objectionable[, i.e., the unconstitutional] part...." 116 Utah at 429, 211 P.2d at 193; *see also Berry,* 717 P.2d at 686.

*Id.* In Utah, then, the test is "whether the legislature would have passed the statute without the objectionable part...." *American Target Advertising, Inc. v. Giani,* 199 F.3d 1241, 1250 (10th Cir.), *cert. denied,* 531 U.S. 811, 121 S.Ct. 34, 148 L.Ed.2d 14 (2000).

"Frequently the courts are aided in the determination of legislative intent by the inclusion within a statute of a 'saving clause.'" *Stewart v. Utah Pub. Serv. Comm'n,* 885 P.2d 759, 779 (Utah 1994) (quoting *Union Trust Co. v. Simmons,* 116 Utah 422, 211 P.2d 190, 193 (1949)). *Id.* But as plaintiffs point out, there is no saving clause in § 76-7–204 to aid our interpretation. "Therefore, we must look to whether the statutory provisions 'are so dependent upon each other that the court should conclude the intention was that the statute be effective only in its entirety.'" *Id.* (quoting *Stewart,* 885 P.2d at 779).

If § 76–7–204(3)(a)'s parentage rule is struck down to the extent it would otherwise have conclusive effect, this court must

decide "whether the remaining sections [of the statute], standing alone, will further the legislative purpose." *Stewart,* 885 P.2d at 779.

Subsections (1), (2), (3)(b) and (5) of § 76–7–204 deal with the enforceability and legal consequences of surrogacy contracts. As explained above, the validity of these provisions is an issue that this court is not called upon to address at this point in this case. Subsection (4), stating that "[n]othing in this section prohibits adoptions and adoption services that are in accordance with the laws of this state" seems unlikely to engender any constitutional controversy at all.

■ This court has reviewed the statute as a whole, and it appears that the "contract" subsections and the "adoptions" subsection of § 76–7–204, "standing alone, will further the legislative purpose" of precluding the enforcement of surrogacy contracts in cases in which such arrangements fall into dispute, and may continue to do so without the aid of the conclusive effect of § 76–7–204(3)(a)'s parentage rule.

In reaching this conclusion, the court is expressing no view as to the validity or unconstitutionality of these subsections. The court is only concluding that these provisions may stand alone, for whatever value they may have, and that the Legislature probably would have enacted them even without giving the § 76–7–204(3)(a) parentage rule conclusive effect.

To the extent, then, that § 76–7–204(3)(a) may be denied conclusive effect under the United States Constitution and the Utah Constitution, the balance of § 76–7–204(1), (2), (3)(b), (4) and (5) appear to be severable from the affected subsection and do not depend upon § 76–7–204(3)(a) to achieve their purposes.

## CONCLUSION

In this case, there is no genuine issue of material fact that plaintiffs J.R. and M.R.

are the genetic/biological mother and father of twin children to whom plaintiff W.K.J. gave birth in January of 2002. As genetic/biological parents of children carried by a gestational carrier surrogate birth mother, J.R. and M.R. have a parent-child relationship with those children to which their fundamental constitutionally protected liberty interests apply. Utah Code Ann. § 76–7–204(3)(a) unduly burdens J.R. and M.R.'s fundamental liberty interests to the extent that it conclusively deems W.K.J. to be "the mother of the child[ren] for all legal purposes," to the exclusion of J.R. and M.R.'s "rights to conceive and raise one's children," *Stanley v. Illinois,* 405 U.S. at 651, 92 S.Ct. 1208, without unwarranted governmental interference.

J.R. and M.R. are entitled to declaratory relief pursuant to 42 U.S.C. § 1983 (2000) and 28 U.S.C. § 2201 (2000) in the form of a judgment that Utah Code Ann. § 76–7–204(3)(a) is unconstitutional as applied to J.R. and M.R. to the extent that it limits or precludes in any way the legal recognition or exercise of J.R. and M.R.'s fundamental rights as parents to raise the children they have conceived. By conclusively presuming W.K.J. to be "the mother of the child[ren] for all legal purposes," and thereby excluding J.R. from recognized legal motherhood of the children from and after the moment of their birth, § 76–7–204(3)(a) oversteps the limits on legislative power imposed by both the United States Constitution and the Utah Constitution in favor of the protection of fundamental liberty interests. U.S. CONST., Amends. IX, XIV; UTAH CONST. Art. I, §§ 7, 25. Upon the presentation of evidence in an appropriate forum establishing J.R. and M.R.'s genetic/biological relationship to the children born to W.K.J., § 76–7–204(3)(a) can have no binding force or effect on the legal

recognition or enforcement of J.R. and M.R.'s parental rights.

J.R. and M.R.'s fundamental liberty interests in their parental relationship with their children arises from the *fact* of the biological parent-child relationship, independent of any grant of right, privilege or designation of status by the State. As cases such as *In re J.P.* instruct, J.R. and M.R.'s parental rights may be extinguished only upon clear and convincing evidence supporting an individualized finding of unfitness, abandonment or other sufficient grounds at a hearing meeting the requirements of the Due Process Clause of the Fourteenth Amendment, and Article I, § 7 of the Utah Constitution; they may not be supplanted or pre-empted by legislative act deeming a gestational surrogate mother to be the "mother of the child[ren] for all legal purposes."

Even as it is called upon to consider new questions thrust upon it by the advent of new technology, the Legislature, no less than the court, must keep the fundamental liberty interests of the people clearly in mind: "[T]he ideals of individual liberty which ... protect the sanctity of one's home and family" are "essential in a free society...." *In re Castillo*, 632 P.2d 855, 856 (Utah 1981). " 'To protect the (individual) in his constitutionally guaranteed right to form and preserve the family is one of the basic principles for which organized government is established....' " *In re J.P.*, 648 P.2d at 1372, 1373 (quoting *Lacher*

*v. Venus*, 177 Wis. 558, 569, 188 N.W. 613, 617, 24 A.L.R. 403, 409 (1922)). As the Utah Constitution so wisely reminds us all, "Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." UTAH CONST. Art. I, § 27.

\* \* \*

This court need not examine the constitutionality of the remaining subsections of § 76–7–204 because they are not in controversy in this action; any evaluation of their respective validity would at this point be purely advisory. Plaintiffs concede they lack standing to challenge § 76–7–204(1), and this court can find no existing dispute among these parties arising under their Agreement that would call into question § 76–7–204(2), (3)(b) or (5). Beyond that, § 76–7–204(4) is purely declarative that existing adoption laws remain undisturbed. Having determined that these provisions are severable from § 76–7–204(3)(a), this court's ruling leaves these remaining provisions essentially undisturbed, and plaintiffs' Complaint is dismissed as to § 76–7–204(1), (2), (3)(b), (4) and (5) without prejudice for lack of an existing case or controversy within the meaning of Article III of the United States Constitution.[40] This court likewise sees no need to decide the validity of plaintiffs' In Vitro/Surrogate Implantation Agreement, and declines plaintiffs' invitation to do so for substantially the same reason, the lack of an existing case or controversy.[41]

---

**40.** This disposition may be variously phrased as a lack of standing on the part of the plaintiffs, or a lack of subject matter jurisdiction on the part of this court, but the end result is the same. Those provisions await adjudication on another day.

Though these claims are dismissed, the defendants have not made the requisite showing that they are entitled to judgment as a matter of law on the merits of these claims and their motion for summary judgment must be de-

nied. As is true of plaintiffs' claims, this court lacks jurisdiction to decide the merits of defendant's Rule 56 motion beyond the question presented by § 76–7–204(3)(a).

**41.** W.K.J. appears as a plaintiff in this action, but pleads no discrete "injury in fact" resulting from the fact that § 76–7–204(3)(a) deems her to be the legal mother of the children born to her in January of 2000. It should come as no surprise to her that the State of

This court defers on plaintiffs' request for injunctive relief forbidding the defendant state officers to comply with or enforce Utah Code Ann. § 76–7–204(3)(a), and requiring that the Utah Office of Vital Records and Statistics issue birth certificates for the plaintiffs' children "reciting that J.R. and M.R. are the parents of the children," pending further hearing on whether "[f]urther necessary or proper relief based on a declaratory judgment" need be granted against "any adverse party whose rights have been determined by such judgment," pursuant to 28 U.S.C. § 2202 (2000). These are questions of remedy rather than substantive right, and a further showing of a threat of irreparable harm may need to be made before such relief is granted.[42]

The declaratory relief set forth herein may well prove to be sufficient to vindicate the plaintiffs' fundamental liberty interests in their relationship with their own children, particularly where it appears that an appropriate state proceeding may be initiated to obtain recognition of that relationship—recognition by a state court that may well be sufficient to bring about the issuance of supplemental birth certificates with the form and content that plaintiffs seek.

Plaintiffs thus may be able to achieve their purposes without further direct intervention by this court into the workings of the government of the State of Utah.

Plaintiffs having demonstrated that there exists no genuine issue of material fact and that they are entitled—at least in part—to judgment as a matter of law, and the court having determined that there is no existing case or controversy as to the remainder of plaintiffs' claims,

**IT IS ORDERED** that the plaintiffs' motion for summary judgment is GRANTED IN PART as to the constitutionality of Utah Code Ann. § 76–7–204(3)(a), as applied to plaintiffs J.R. and M.R. and to the extent explained above, and DENIED IN PART as to the remainder of plaintiffs' substantive claims; plaintiffs' claims concerning the constitutionality of the balance of § 76–7–204(1), (2), (3)(b), (4) and (5) are DISMISSED WITHOUT PREJUDICE for want of an existing case or controversy; and that defendants' motion for summary judgment is DENIED.

---

challenged statute, this court likely must also dismiss her claim for lack of standing.

**42.** This court likewise defers the question of an award of nominal damages and statutory attorney's fees and costs (42 U.S.C. § 1988) for further consideration at an appropriate time and upon an appropriate record.

---

Utah presumes in the first instance that the birth mother is the mother of children to whom she has given birth. Nothing now before this court suggests that W.K.J. is not free to relinquish her parental rights in favor of J.R. and M.R., as apparently she has planned to do. Absent some more particularized showing of injury-in-fact flowing from the